UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 15-151 (ESH) |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL WHITTAKER,** | : | |
| Also known as "Mike Zek Bro" | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. Defendant Michael Whittaker was part of a widespread conspiracy in which he attempted to defraud the Internal Revenue Service out of approximately $494,902.80 through the filing of 135 fraudulent federal income tax returns. The U.S. Probation Office's Presentence Investigation Report ("PSR") properly calculated Defendant's total offense level at 17, and it calculated his criminal history category at III, with a corresponding United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines") range of incarceration of 30 to 37 months.

It is the government's position that a sentence within the advisory Guidelines range of 30 to 37 months is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553, and, accordingly, the government respectfully recommends that the Court impose a sentence within that range.¹ Given that most of Defendant's criminal history points are attributable to traffic offenses, and given that the government originally estimated his criminal

---

¹ As described in the plea agreement, the government estimated Defendant's criminal

history category to be II (as described in the plea agreement), the government believes that a sentence at the low end of the Guidelines range would be appropriate. The government also requests that the Court order Defendant to pay restitution to the IRS in the amount of $397,090.95, as the parties agreed.

I. **Factual Background**

From in or about August 2010 through in or about May 2012, Defendant conspired to commit the offense of theft of public money, in the amount of approximately $494,902.80 through the filing of 135 fraudulent federal income tax returns.

Defendant obtained, possessed, and transferred to co-conspirator Kevin Brown and others at least 21 different means of identification that were used in the preparation of approximately 45 fraudulent U.S. individual income tax returns, Forms 1040, claiming fraudulent income tax refunds in the amount of approximately $116,099.30. Based on these fraudulent returns, the IRS issued 25 U.S. Treasury checks, all of which were later negotiated by Defendant or his co-conspirators.

In addition, Defendant permitted residential addresses that he controlled to be used by co-conspirator Kevin Brown and others as the "taxpayer" address in the preparation of approximately 41 fraudulent U.S. individual income tax returns claiming fraudulent income tax refunds in the amount of approximately $134,657.50. Based on these fraudulent returns, the IRS issued 32 U.S. Treasury checks, 28 of which were later negotiated by Defendant or his co-conspirators.

---

history category to be II.

Finally, Defendant deposited into his bank account at Capital One Bank, Account Numbers XXXXXX-7019 and XXXXXX-4392, 55 U.S. Treasury checks, totaling approximately $266,327.70, which were obtained in the fraudulent refund scheme.[2]

Defendant received compensation for his role in the conspiracy, although it is unclear exactly how much he received. In his initial interview with law enforcement in 2013, he admitted to receiving $100 for each check mailed to an address he controlled, which would mean that he received $3,200 (for the 32 such checks) for this part of his role in the scheme. Defendant also admitted to receiving $150 for each check that he deposited into one of his bank accounts, which would mean that he received $8,250 (for the 55 such checks). Defendant later told the government attorneys that he received $150 for each name that he gave to co-conspirator Kevin Brown (for the 21 such names). Thus, the government estimates that Defendant received at least $14,600 for his role in the refund fraud scheme.[3]

## II. Procedural Background

On October 30, 2015, a grand jury returned an indictment charging Defendant and two of his co-conspirators with one count of conspiracy to commit theft of public money, in violation of 18 U.S.C. § 371. Defendant was also charged with one count of theft of public money, in violation of 18 U.S.C. § 641, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). On January 20, 2016, Defendant pleaded guilty to one count of conspiracy to

---

[2] Of the 55 refund checks deposited into Defendant's bank accounts, six checks worth $22,181.70 were sent to residential addresses that he controlled, as described above.

[3] During his interview with government attorneys, Defendant stated that he received money from the scheme in two other ways: he was paid $100 per check by Kevin Brown to sign his name and payee names on scheme checks, and he was paid $500 per check to cash scheme checks at a liquor store. The government was not aware that Defendant also played these roles in in the scheme and is unable to quantify the associated loss caused by, or personal gain to, Defendant. However, this indicates that the government's estimate of Defendant's personal gain

commit theft of public money and one count of theft of public money. He also agreed to pay $397,090.95 in restitution to the IRS. Sentencing is scheduled for September 21, 2016.

**III.   A Sentence of 30 to 37 Months is Appropriate Based on the Sentencing Guidelines Calculation**

The parties have agreed that Defendant's total offense level is estimated to be 17 under the voluntary Sentencing Guidelines. (Plea Agreement, ¶ 4.) The PSR has also correctly calculated Defendant's total offense level at 17. (PSR ¶ 69.) This includes a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2), an addition of 12 levels for loss of more than $250,000 but less than $550,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), and an addition of two levels because the offense involved ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A). (PSR ¶¶ 59-61.) With a three-level decrease in the offense level for Defendant's timely acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a)–(b), the total offense level is 17. (PSR ¶¶ 67-69.)

The parties estimated Defendant's Criminal History Category to be II. (Id.) That level calls for a sentence of 27 to 33 months of incarceration. Under the plea agreement, the parties agreed that "a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a)." (Plea Agreement, ¶ 5.) However, the PSR calculated Defendant's Criminal History Category to be III. (PSR ¶84.) That level calls for a sentence of 30 to 37 months of incarceration. The government now believes that the PSR's criminal history calculation is correct, but requests a sentence at the low end of the Guidelines range, given that the majority of Defendant's criminal history relates to traffic offenses.

---

is, if anything, too low.

A. <u>Loss Valuation is Properly Calculated at Over $250,000</u>

As already noted, Defendant agreed in the written plea agreement to a total loss of $494,902.80 based on a) the fraudulent income tax refunds claimed on the 45 tax returns filed using 21 means of identification provided by Defendant to his co-conspirators, b) 41 fraudulent refund checks that Defendant's co-conspirators requested be sent to the residential addresses Defendant controlled, and c) 55 fraudulent refund checks Defendant deposited into his bank accounts. Thus, a 12-level increase for a loss greater than $250,000 is appropriate.

B. <u>Ten or More Victims</u>

In the plea agreement, the parties agreed to a calculation that includes an adjustment for ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A). For purposes of subsection (b)(2), in a case involving means of identification, "victim" means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority. U.S.S.G. §2B1.1 n.4(E). In this case, Defendant transferred the means of identification of at least 21 individuals to his co-conspirators to be used in the fraudulent refund scheme, and approximately 45 tax returns were filed using those identities. In addition, Defendant allowed addresses he controlled to be used as the "taxpayer address" on approximately 41 tax returns filed with the IRS in the names of other individuals. Finally, 55 checks were deposited into Defendant's bank accounts using other individuals' means of identification. Taking together all of the individuals whose means of identification Defendant used unlawfully in this scheme, a two-level increase for ten or more victims is appropriate.

C. <u>A Downward Departure Based Upon U.S.S.G. § 5H1.4 Is Not Warranted</u>

Pursuant to the plea agreement, Defendant may seek a downward departure from the Guidelines range under U.S.S.G. § 5H1.4. (Plea Agreement, ¶ 4(C).) It is the government's

position that Defendant does not meet the relatively strict standards for application of these departures.

Section 5H1.4 of the Sentencing Guidelines provides, in pertinent part:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment. . . . In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose.

U.S.S.G. § 5H1.4. In short, the text of § 5H1.4 requires the defendant to establish an "extraordinary physical impairment," such as one that renders the defendant seriously infirm.

The bar to establish an extraordinary medical impairment is a high one. *See e.g., United States v. Goodwin*, 594 F.3d 1, 7 (D.C. Cir. 2010) (finding pain derived from severe drug burns on over 60% of defendant's body obtained over 20 years prior would not warrant a downward departure); *United States v. Brooke*, 308 F.3d 17, 21 (D.C. Cir. 2002) (finding a swollen knee, chest pain, arthritis, and respiratory problems did not warrant a downward departure); *United States v. Mason*, 966 F.2d 1488, 1498 (D.C. Cir 1992) (finding gunshot wound did not constitute an "extraordinary physical impairment" due to absence of evidence that the wound was extraordinary and the fact that defendant "fully recovered"); *United States v. Turner*, 531 F. Supp. 2d 123, 130 (D.D.C. 2008) (finding congestive heart failure, diabetes, and degenerative joint disease did not warrant a downward departure because medical reports failed to indicate that these conditions are "likely to require immediate intervention").

Indeed, courts have been reluctant to grant relief under § 5H1.4 except in extraordinary cases where the defendant can show that the medical condition cannot be properly treated or

accommodated in prison. *United States v. Goodwin*, 607 F. Supp. 2d 47, 52 (D.D.C. 2009) (finding that the defendant failed to show that the prison could not provide treatment for his serious burns or that the burns constituted an "extraordinary physical impairment"), *aff'd*, 594 F.3d 1; *United States v. Dyce*, 975 F. Supp. 17, 22 (D.D.C. 1997) (granting § 5H1.4 downward departure because defendant's complicated regime of medication and treatment resulting from a stroke were best handled at home rather than prison, where treatment was costly and defendant might be endangered); United States v. *Adonis*, 744 F. Supp. 336, 343-44 (D.D.C. 1990) (granting § 5H1.4 downward departure because defendant was a retarded individual, who was attacked by fellow inmates due to his limited intelligence and was "extremely vulnerable to further attack" in prison).

The *Turner* case is instructive here. The district court described Turner's medical condition as follows:

> [A]sthma requiring treatment from steroids and inhalers; sleep apnea requiring the use of a continuous positive airway pressure device and oxygen at night; post-traumatic stress disorder resulting in headaches and seizures; congestive heart failure; gout and degenerative joint disease occasionally requiring treatment with narcotics; diabetes treated by medication but not fully controlled; severe peripheral neuropathy; renal failure; temporary spells of blindness; and a possible autoimmune disease such as lupus.

*United States v. Turner*, 818 F. Supp. 2d 207, 209 (D.D.C. 2011). In rejecting a downward departure, the court recognized that the numerous medical issues were "serious, severely limiting, and permanent" but nonetheless did not constitute an extraordinary physical impairment. *Id.*

Like the defendant in *Turner*, Defendant has many medical issues, but his medical condition, as described in the PSR and his memorandum in aid of sentencing, does not rise to the level of an "extraordinary physical impairment" that warrants a downward departure.

**IV.     The Section 3553(a) Factors Support a Sentence of Incarceration of 30 to 37 Months**

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." United States v. Gall, 552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," id. at 46, and are the "starting point and the initial benchmark." Id. at 49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).[4] Id. at 49-50. As discussed below, a consideration of these factors favors a sentence consistent with the advisory Guidelines range of 30 to 37 months.

     A.    <u>Nature and Circumstances of the Offense and Its Seriousness</u>

Stolen identity refund fraud is a nationwide epidemic, and Defendant's conduct in this case was serious. This scheme involved layers of individuals whose participation contributed to the success of the scheme. Defendant had multiple roles in this scheme. First, he transferred to co-conspirators at least 21 means of identification that were used in the preparation of approximately 45 fraudulent tax returns. Second, he allowed residential addresses that he controlled to be used as the "taxpayer" address on approximately 41 fraudulent tax returns. Finally, Defendant deposited checks into two of his bank accounts without the permission or

---

[4] Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the offense as set forth in Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims

knowledge of the payee of each check. To summarize, Defendant's participation in this scheme was active and varied. Accordingly, the nature of Defendant's conduct warrants a significant sentence.

B.  Defendant's History and Characteristics

Defendant's history and characteristics suggest that the recommended sentence is appropriate. Defendant is a 31-year old with no high school diploma. (PSR ¶¶ 95, 115.) Defendant has multiple criminal convictions, and he committed the instant offense while under a criminal justice sentence. (PSR ¶¶ 82-83.)

C.  The Need to Promote Respect for the Law
    and Deter Similar Criminal Conduct

The IRS is working tirelessly to combat the nationwide epidemic of stolen identity refund fraud which has exploded in the past few years. In FY2015, the IRS initiated approximately 776 identity theft-related criminal investigations. See IRS Statistical Data - Identity Theft Investigations, available at http://www.irs.gov/uac/Statistical-Data-Identity-Theft-Investigations. Identity theft remains a substantial problem, which cost the government more than $5 billion in a recent year alone. See GAO August 20, 2014 Report on Identity Theft, available at http://www.gao.gov/products/GAO-14-633.

It is imperative that Defendant receive a sentence which not only deters him, but also sends a message to the public that stealing taxpayer identities and taxpayer dollars is a serious offense which will be punished with a significant period of incarceration. Absent such deterrence, others will see the result in this case and cynically conclude that the risks of being caught and punished for stolen identity refund fraud do not outweigh the potential rewards.

---

of the offense.

D. <u>The Need to Avoid Unwarranted Sentence Disparities</u>

A sentence within the advisory Guidelines range would be consistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(1)(6). Compared to the organizers, managers, bank employees, and mail carriers who participated in this scheme, Defendant is less culpable. On the other hand, compared to several other conspirators in this scheme who have pleaded guilty and been publicly sentenced, Defendant is somewhat more culpable. (<u>See</u> chart of public sentences in this conspiracy to date, attached as Exhibit 1.) Unlike some of the conspirators who received lighter sentences than the government is requesting here, Defendant had several different roles in the fraud scheme. His sentence should reflect his culpability, the sizable loss for which he is responsible, and the windfall he received from his participation in the scheme. Of the co-conspirators in this scheme who have been publicly sentenced to date, five defendants are more culpable than Defendant, and four of those defendants have received longer sentences than the government is requesting for Defendant: Marc Bell, Alvalonzo Graham, Yvette Haden, and James Nelson. In contrast, seven defendants who are below Defendant's level of culpability (taking criminal history into account) have received sentences lower than the government is requesting here: April Arnold, Theaudrey Cook, Ayesha Harris, Lakisha Jackson, Mercedez Moore-Johnson, Bernard Rankin, and Ezekiel Raspberry.

Accordingly, it is the government's position that a sentence for Defendant that falls within the advisory Guidelines range of 30 to 37 months, and at the low end, would be consistent with the need to avoid unwarranted sentencing disparities. Compared to those co-conspirators who received lesser sentences than the government is requesting here, Defendant is significantly more culpable and has a higher Criminal History score.

E. <u>Other Sentencing Factors</u>

A sentence within the advisory Guidelines range would be consistent with the other Section 3553(a) factors. Given Defendant's various medical issues, the Court can and should order that Defendant be provided all necessary medical treatment while in prison, and the Court can recommend that Defendant's medical needs be the overriding factor in the U.S. Bureau of Prisons' consideration of his placement. Furthermore, given Defendant's lack of a high school diploma, the Court can and should order that Defendant be provided with educational or vocational training while in prison.

**V.     Restitution**

The parties have agreed that Defendant will make restitution of $397,090.95 to the IRS. (Plea Agreement, ¶12.) This is the amount of actual loss suffered by the IRS as a result of Defendant's conduct. This amount should be joint and several with co-conspirator Kevin Brown.

**VI.     Conclusion**

Defendant helped cause a tax loss of nearly $400,000 to the IRS while participating in an ongoing tax refund fraud scheme. Crimes of this nature are an affront to all law-abiding taxpayers who faithfully file accurate tax returns year after year and pay their share of taxes due and owing based on their economic circumstances. It is imperative that Defendant and those in a similar position to Defendant, faced with the temptation to personally profit from participating in this or a similar scheme, be deterred from any future efforts to defraud the IRS of taxpayer dollars. For the foregoing reasons, the government respectfully recommends that this Court impose a sentence at the low end of the Guidelines range of 30 to 37 months of incarceration. The government further requests that Defendant be ordered to pay restitution to the IRS in the amount of $397,090.95.

        Respectfully submitted,

        CHANNING D. PHILLIPS
        United States Attorney

By: /s/ Thomas F. Koelbl
        ELLEN CHUBIN EPSTEIN
        D.C. Bar No. 442861
        Assistant United States Attorney
        555 Fourth Street, N.W.
        Washington, D.C. 20530
        (202) 252-7861
        Ellen.Chubin@usdoj.gov

        Jeffrey Bender
        Thomas F. Koelbl
        Trial Attorneys
        Department of Justice, Tax Division
        601 D Street N.W., Washington D.C.
        (202) 305-4077
        (202) 514-5891
        jeffrey.b.bender@usdoj.gov
        thomas.f.koelbl@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon counsel for the Defendant, via ECF, this 14th day of September, 2016.

        /s/ Thomas F. Koelbl
        Thomas F. Koelbl